Plaintiff brought this suit against the insurer of his employer for compensation for total and permanent disability at the rate of $20 per week, for a period not exceeding 400 weeks, plus medical expenses of $500. He alleges in his petition that while on his way to deliver a tire for a customer of his employer, the Louisiana Tire supply Company, he was thrown from a truck driven by the manager of the said company and sustained a fracture of the radius of the left arm and injuring the lower part of his back. The defendant admits that plaintiff received a small fracture of the distal tip of his left radius, and admits paying him compensation in the total sum of $246.66 to cover compensation from the date of the injury, November 11, 1945, to February 20, 1946. Defendant alleged that plaintiff had fully recovered from the injury at the time compensation was discontinued and denied that he suffered any further disability.
The plaintiff had filed a suit on his claim in the Federal court, but, after a trial before a jury, the United States District Judge dismissed the suit for lack of the necessary jurisdictional amount in controversy of $3000. The jury did not pass on the facts in the case. The plaintiff then filed the present suit in the State court.
After a trial in the district court, the trial judge rendered a judgment in favor of plaintiff for compensation at the rate of $20 per week from February 20, 1946, to and including April 22, 1947, plus the sum of $123.85 for medical expenses, together with interest and expert witness fees. All other claims of plaintiff were rejected beyond the amount covered by the judgment. Plaintiff had execution issue on the judgment, and the defendant thereupon paid the amount of the judgment in full.
Plaintiff asked for and secured an order of appeal from the judgment on the same day that the writ of execution issued. The defendant has filed a motion in this court to dismiss the appeal on the ground that the plaintiff has acquiesced in the judgment by forcing payment thereof.
 Motion to Dismiss.
[1] For some time the jurisprudence of the State was in confusion as to the right of a plaintiff to take an appeal from a judgment which he voluntarily executes or on which he causes execution to issue where the judgment was for a less amount than he claimed was due him. This matter was finally settled by the Supreme Court in the *Page 480 
case of Foster Glassell Co., Limited, v. Harrison et al.,173 La. 550, 138 So. 99, where it was held that a plaintiff does not lose his right to appeal from a judgment in which all of his claim was not allowed, although he proceeded to execute the part of the judgment in his favor against the defendant. For these reasons, the motion to dismiss the appeal is overruled.
[2] The defendant filed an answer to the appeal in which it asked that the judgment be reversed insofar as it awarded plaintiff part of his claim for compensation and that plaintiff's suit be dismissed; or, in the alternative, that the judgment be affirmed; or in the further alternative, that the judgment be amended so that the plea of res adjudicata which it had filed in the district court be sustained. This plea is based on the ground that, as the Federal Court had held that there was not involved in controversy an amount exceeding three thousand dollars, and as plaintiff had not appealed from that judgement, that part of his claim in excess of $3000 has become res adjudicata. While the conclusion we have reached renders this plea inapplicable to our decision of the case on the merits, yet we might say in passing that under the Federa Rules of Civil Procedure, Rule 41 (b), 28 U.S.C.A. following section 723c, a judgment dismissing a suit for lack of jurisdiction does not operate as an adjudication on the merits.
 Merits.
The only issue in the case is the extent and duration of plaintiff's disability, that is whether or not he was disabled after February 20, 1946, the date on which compensation payments were discontinued; or whether he was disabled from said date to April 22, 1947, the date to which the trial court allowed compensation; or, as plaintiff claims, he is and has been disabled for a longer period that that allowed by the trial judge.
Plaintiff testified that he hurt his arm when he was thrown from a truck being driven by his foreman; that his arm and back both hurt at the time, but he did not take the back injury seriously, as the most pain was in his arm. He went to a doctor of his own race (colored) the next morning, and this doctor bandaged his arm, but did not do anything to his back. He told the doctor that his back hurt him a little. He continued working at the service station, doing the things that he could do with one hand, such as putting gas in cars and wiping windshields. He had been changing tires, greasing and washing cars before he was injured. He went to see Dr. Joseph (the colored doctor) several times, and he admits that he did not complain to Dr. Joseph about his back except the first day or so. Dr. Joseph removed the bandage from his arm, and told him he would get all right. Plaintiff then went to see Dr. Thom.
Dr. Joseph saw plaintiff about a dozen times between November 12, 1945, and February 20, 1946, and treated the fracture of his wrist by placing a bandage on his arm and giving him treatment over this period of time. The doctor thought the fracture was healed in February, 1946, and thought plaintiff was able to return to work. The doctor says that plaintiff never complained of his back after the first two or three days and for that reason the doctor did not give him any treatment for his back.
Plaintiff says he went to see Dr. Thom because Dr. Joseph would not pay any attention to his back injury, even though he admits that he never complained to Dr. Joseph about his back, except for a day or so after the accident. It is significant to note that plaintiff did not emphasize his back injury until his doctor pronounced his arm injury sufficiently cured for him to go back to work, which was over three months after the injury.
The lady for whom plaintiff was working testified that he never complained about his back until an x-ray taken of his arm in February, 1946, showed that the fracture had healed. She says that he was a good worker around the service station before the accident, and during the time his arm was in a sling he tried to do the lighter work, but after his arm healed he began to neglect his work and complained of his back. She told him to go home and return when he felt like taking his job back, but he never came back to take his job. The strongest evidence in support of plaintiff's claim to back pain was given by Dr. *Page 481 
Kuehnle who first examined plaintiff in March, 1946. He found the healed fracture in plaintiff's wrist, with slight limitation of movement in that wrist. He found moderate tenderness in plaintiff's lower back and moderate muscle spasm. The doctor found about the same condition on two subsequent examinations. He thought plaintiff had some disability in February, 1947. This doctor states that if plaintiff hurt his back in November, 1945, and was suffering from that injury to his back, he should have had pain in his back before February, 1946.
Dr. Bannerman examined plaintiff the last time in February, 1947, and reported that he found a healed lumbrosacral strain and healed fracture of the left radius with a mild arthritic change. The doctor was of the opinion that plaintiff was able to return to work. Dr. McVea examined plaintiff a second time in February, 1946, at which time he says the old injury to plaintiff's back and wrist had healed and there was no residual disability. He thinks plaintiff was then able to work. At least three doctors (including the doctor whom plaintiff first consulted) were of the opinion that plaintiff is able to work. Practically all the doctors say that the injury to his wrist is very slight and should not interfere with its use in a normal way. The limitation in the use of the wrist was fixed at not over five or ten per cent.
Dr. Thom first examined plaintiff in February, 1946. He says plaintiff came in his office with a slight limp, complaining of trouble with his back and wrist. The only objective finding of the doctor was some rigidity in plaintiff's lower back muscles. The doctor taped his back with adhesives to immobilize his back. The doctor saw plaintiff some seventeen times during 1946, and he says that when he saw him in December of that year there was less rigidity in his back muscles. Dr. Thom saw plaintiff later, and he states that he still had some tone or rigidity in the lower back muscles and a nervous condition which he attributed to worry over his physical and financial condition.
In order to show that plaintiff does suffer back pain, counsel for plaintiff places much stress on what is known in the medical field as Robertson's Sign or Test, which test was used on plaintiff in this case. The sign is defined in one of the medical books introduced in evidence as follows: "In the malingerer or neurasthenic, when alleged pain is complained of, pressure over the area fails to produce dilation of the pupils which invariably follows when pressure is made upon any painful area resulting from an organic lesion."
Some of the doctors did not put much faith in this test, while others thought it would be of help in determining whether or not pain was actually present upon pressure over the area complained of. In regard to this test, the trial judge made the following pertinent statement in his reasons for judgment:
"At the time of the trial on February 27 and April 22, 1947, this Court examined plaintiff's back and observed what Dr. Kuehnle called mild muscle spasm in the erector spinae muscles on the left side in the lumbar region, and what Dr. Thom called rigidity of the muscles or muscle tone. Furthermore, the application of Robertson's Sign test indicated this area was tender and painful to pressure. After watching the application of this Robertson's Sign test and hearing the doctors discuss it, this Court is of the opinion that this test may be of assistance to diagnosticians in ascertaining whether or not a patient is a malingerer, but of little value otherwise, because any pain large or small causes the same reaction. There is no relation between the intensity of the pain and the amount of dilation of the pupils of the eyes. Furthermore, any sensory emotion causes the same reaction. There can be no doubt, however, that pain causes a dilation of the pupils and thus, a doctor with experience in using it could undoubtedly get some help and benefit where there was a question of whether or not the patient was a malingerer."
The trial judge concludes his reasons for judgment with the following statement:
"The plaintiff had probably recovered so as to be able to return to his former employment by February 20, 1947, or within one year after the defendant stopped his compensation payments. However, there may be some question about it so this Court *Page 482 
has concluded to give him the benefit of the doubt and allow him compensation to the date of the termination of the trial on April 22, 1947. At this time the tests conducted by the doctors under the Court's observation clearly indicated that the plaintiff was able to return to his former employment."
[3] We find no error in the conclusions of the trial judge. He has carefully reviewed the evidence, and we think his conclusions are justified by the record.
For the reasons assigned, the judgment appealed from is hereby affirmed.