ELLIS, Judge.
This suit arises out of a workmen’s compensation claim for total and permanent dis•ability resulting from an accident alleged to have occurred on February 1, 1958. The 'defendants paid compensation from the period of February 1, 1958 through September 5, 1958, except for the last two weeks, the parties stipulated that the amount of compensation was $980, plus medical expenses amounting to $1,201.69.
After a trial on the merits to determine whether the plaintiff was permanently and totally disabled, the lower court rendered ■judgment in favor of the plaintiff, Willie Mitchell, Jr. awarding him compensation for a period of 63 weeks commencing February 1, 1958 and ending April 11, 1959, at the rate of $35 per week with interest at the rate of 5% per annum on each unpaid installment, subject to a credit for compensation paid by the defendant, at the rate of $35 per week to August 24, 1958, taxing as costs, the expert witness fees of $50 each for Doctors Wilson Morris, Charles V. Hatchette, B. M. Woodard, Dr. Arthur S. Alexander, Dr. Earl N. Rafes and Dr. Homer D. Kirgis. Plaintiff’s claim for penalties and attorney’s fees were rejected.
An appeal has been perfected to this Court from the judgment set forth *493 above. Following the appeal to this court, the plaintiff was paid the full amount of the judgment as rendered by the lower court and defendants have moved to dismiss the appeal on the grounds that the plaintiff executed a release of the judgment and is, therefore, estopped from prosecuting the appeal. The contention of the defendant, in his motion to dismiss the appeal was recently decided by us against defendant’s position in Washington v. Independence Oak Flooring Company, La.App., 114 So.2d 599, 600, where we stated:
“Since Foster & Glassell Co. v. Harrison, 173 La. 550, 138 So. 99, it is well settled that a plaintiff who executes upon or receives payment of so much of a monetary award as is in his favor does not by so doing acquiesce in the judgment so as to prevent his appealing from the rejection of part of his demand. Likewise, a compensation claimant who voluntarily accepts payment of a judgment granting him a limited amount of compensation may nevertheless appeal from said judgment and obtain an increase in the compensation benefits awarded. Cory v. Askew, 169 La. 479, 125 So. 455; Trimble v. Employers Mutual Cas. Co., La.App. 1 Cir., 32 So.2d 479; Grigsby v. Texas Co., 2 Cir., 14 La.App. 689, 130 So. 871.”
Although defendants have questioned somewhat the veracity of the plaintiff, the evidence as a whole is not materially in ■conflict concerning the occurrence of the accident.
Plaintiff, Willie Mitchell, Jr., testified and his employer admitted, that on February 1, 1958, Willie Mitchell was sent to New Iberia to pick up a gravel conveyor weighing in the neighborhood of 300 pounds. Plaintiff' was alone on the trip when he went out to the Jet Air Base in New Iberia. While he was at the jet air base and attempted to lift the conveyor on the truck, one end of the conveyor fell off the truck. Plaintiff was holding on to the other end of the conveyor when it fell, causing him pain in his back. The plaintiff then decided that he needed help and drove into Iberia to obtain assistance from his brother-in-law, Richard Roman, who also appeared as a witness. He corroborated plaintiff’s version of the accident and the fact that plaintiff complained of hurting his back while attempting to load the conveyer.
Plaintiff’s wife and brother also corroborated the fact that he was injured and complained of hurting his back while in New Iberia. The plaintiff attempted to continue working despite the pain, but on the Friday night following his injury on February 1, his back began to pain him so intensely that he was taken to the hospital by his family and was given drugs for his pain. His first examination, upon admission to the hospital, emergency room was tentatively diagnosed by Dr. Topp as renal calculus. However, Dr. Topp was called out of town and referred her patient to Dr. B. M. Woodard in order for him to treat the plaintiff. He was primarily the attending physician throughout plaintiff’s disability.
The real bone of contention in this case is whether the plaintiff was disabled at the time of the trial to the extent that he was totally and permanently disabled, or whether he was, as of the date of the trial, able to work in his usual occupation. This issue, if possible, must be resolved by first examining the medical testimony taken in the case. The attending physician, Dr. B. M. Woodard, who first saw the plaintiff on February 10, 1958, testified that he examined Willie Mitchell, finding him to have a moderate vertebral muscle spasm, and put him in traction. He diagnosed his trouble as strain to the lower back muscles. After the plaintiff was discharged from the hospital on February 17, 1958, Dr. Woodard called in an orthopedic specialist, Dr. Hatchette. Dr. Woodard treated plaintiff until September 5, 1958' and his bill was $564, at which time he was of the opinion plaintiff was fully recovered from his injury and was able, to return to work.
*494 On March 18, 1959, Dr. Hatchette first examined plaintiff whose examination revealed the following:
“ * * * The patient was stripped of clothing and no abnormalities noted in the back region. Flexion was limited approximately 2 plus, the finger tips coming to the level of the knees only. (Emphasis ours) Beyond this point he complained of rather severe pain in the midline of the low back at the level of the fourth lumbar vertebra. Recovery to an erect position was slow with mild muscle spasm noted on both sides of the low back but being more prominent on the left side. The patient appeared quite apprehensive during the examination. Right and left lateral bending were both limited but more so on the left side. He complained of pain radiating into the left hip region on this motion. Extension of the lumbar spine appeared fairly normal.
“With the patient in the supine position on the examining table, straight leg raising was positive on the left side at 115 degrees with referred pain to the left low back region. It was negative at 90 degrees on the right side. The Patrick’s signs were bilaterally negative and the flexed leg tests were normal. The sciatic bow string test was positive on the left and negative on the right. He complained of hypesthesia to pinprick over the lateral left thigh, lateral left leg, the medial aspect of the leg and over the dorsum of the foot, including the first three toes. The ex-tensor of the left great toe was slightly weak as compared to the right. The left Achilles reflex was also slightly diminished as compared to an active reflex on the right side. Lower extremity length and size was equal.
“X-ray examinations made at Lake Charles Memorial Hospital including a lumbosacral series were reported as essentially negative for evidence of injuries, abnormalities or diseases of the lumbar spine, lumbosacral area or sacro-iliac synchondroses.
“It was my opinion following examination of this man that he was disabled and would suggest that he not attempt to return to any work until the diagnosis was cleared up somewhat * * * ”
* * * # * *
“It was questionable as to whether or not this man had some nerve root compression in the low back region but there were signs and symptoms which indicated the possibility of this condition. This might be due to a ruptured disc at the level of the fourth or fifth lumbar interspaces on the left side and it was my belief it would be valuable to him to have the myelogram performed so that definite conclusions could be reached. Until such time as the question of nerve root compression was cleared up, I would not suggest that he return to his regular duties.”
Dr. Hatchette further testified that plaintiff cooperated well in the examination and was mentally alert and that he had the myelogram performed on the plaintiff on March 20, 1958 by Dr. Alexander. Both Dr. Alexander and Dr. Hatchette agreed that the myelogram was essentially normal except for non-visualization of the left nerve root sheath on the various views of the fifth lumbar level, which was the most important view as the ruptured disc was believed to be there, the doctors’ opinion being that this finding was not significant enough to make a diagnosis of the ruptured disc at that time. We might add that this myelogram test did not rule out a ruptured disc but was a possible verification thereof, as Dr. Hatchette admitted it was a possible indication of some space occupying protrusion into the spinal canal. He further testified:
“Q. On the date of your last examination, Doctor, your findings were very largely negative, I take it. Do persons who suffer from ruptured inter- *495 vertebral discs have what are known as good days and bad days? A. Yes, sir.
“Q. Would you describe that phenomenon to the Court? A. This is called a remission of symptoms. Assuming of course, that you do have nerve root compression, now nerve root compression is purely a mechanical phenomenon, and if there is just beneath the nerve root, that is a completely ruptured disc beneath the nerve root or bulging of the posterior spinous ligament from a potentially ruptured disc this might shift. A ruptured disc is like any other hernia. It might reduce itself. Sometimes these bulges will reduce themselves and there will be a remission of pain and they they will come back and pain will be produced again. The same thing applies to a completely ruptured disc where a part of the disc has come out through the posterior spinous ligament and is under the nerve root itself. If that shifts for any reason due to posture and the pressure is taken off of the nerve root, then the man has complete relief of discomfort and he feels practically as well as he ever did without any pain, but they are peculiar in that sense of the word.
“Q. Is it possible, sir, that a qualified orthopaedist could examine a man having a ruptured disc on one of his so called good days and have largely negative findings? A. Yes.
“Q. Now, assuming for the purposes of this question, Doctor, that Willie Mitchell Jr. actually, in fact, does have a ruptured disc. Do you think that this would disable him from hard manual labor ? A. Yes.”
Dr. Hatchette again examined the plaintiff on June 18, 1958 and at that time found that he was improving in a satisfactory manner, but that he was not at that date ready to return to his regular duties as a truck driver.
Dr. Hatchette again examined the plaintiff on March 16, 1959, at which time he concluded that the plaintiff was exaggerating his symptoms and was no longer injured and had sufficiently recovered from any injuries to such an extent that he was able to work and should return to work immediately. His conclusion was based upon the findings of his examination.
Dr. Homer D. Kirgis, a neurosurgeon whose deposition was taken in New Orleans, examined the plaintiff on October 21, 1958. His examination revealed the following :
“A. The neurological examination revealed a patient who walked normally, except for the fact he held his back rather stiffly. He sat, during much of the interview, with most of his weight of his trunk on his right buttock. Upon standing, there was flattening of the lumbar spine which was obviously due, at least in part, to a moderate degree of spasm of the lumbar para-spinous muscles.
“Q. Excuse me, Doctor. What significance does muscle spasm have? A. Well, of course, muscle spasm may be due to many things, but the factors usually can be divided into those which are due to direct irritation to the muscle, or irritation to the portion of the nervous system which supplies the muscle. The contraction of the muscles of this type, that is spasms, should be distinguished from voluntary contraction of the muscles which is a reaction, a voluntary reaction of the patient in contrast to a reflex action which is indicated by spasm. In this situation I think that the spasm of the muscles was due to irritation of the nerves, the nerve endings in the back, and was a reaction to the patient’s pain.
“Q. Thank you, Doctor. Would you please continue with your description of your examination and findings? A. There was exacerbation of the pa *496 tient’s pain in the lower back on pressure over the fourth and fifth lumbar vertebrae and over the adjacent para-spinous area on the left. With such stimulation, the pain radiated into the posterolateral aspect of the left thigh. There was a moderate degree of restriction of the normal range of motility of the lower spine. Left lateral flexion and posterior flexion of the lower spine were most painful and most limited. There was a slight cimi-nution in sensation over the postero-lateral aspect of the left thigh. Vibratory sensation was normal. The straight leg raising test on the left was moderately positive at forty-five degrees for exacerbation of pain in the back and in the left thigh. With the leg held at this point, dorsiflexion of the foot increased the pain further. The straight leg raising test on the right caused an increase of the pain in the back and in the left thigh at sixty degrees.
“Q. Excuse me, Dr. Kirgis. You indicated that the straight leg raising test was positive at forty-five degrees on the left and sixty degrees, I believe, on the right. What is the significance of this test and this finding? A. This is a test that helps one evaluate particularly the presence or absence of irritation to nerves. With injuries of the lower back, there usually is some asym-etry of the symptoms, indicating that the pathology is greater on either the right or left of the midline of the back. In this particular instance, the patient’s complaint was of pain in the lower part of the back and in the left leg. Therefore, it was consistent with his complaint that the straight leg raising test should be positive at a smaller angle, such as forty five degrees, as compared with the angle at which it became positive on the opposite side, that is the right side.
“Q. Thank you. Would you please continue? A. The flexed leg bending test was moderately positive on the left for exacerbation of the pain in the back. This test was slightly positive on the right. Flexion of the lower extremity followed by extension of the leg duplicated the reaction produced by the straight leg raising test. Exertion-of pressure to the popliteal space, that is at the space behind the knee, was negative on the right and moderately positive for pain in the thigh on the left.
“Extension of the right lower extremity while the patient was sitting was slightly poisitive for exacerbation-of the pain in the back, and when this-test was applied to the left lower extremity there was a moderate degree of exacerbation of the pain in the back and to the left thigh.
“Q. Were x-rays made of Mitchell ? A. Yes.”
Dr. Kirgis concluded that the plaintiff was unable to work because of pain in the-lower part of the back, possibly due to-nerve root irritations, and that the usual non-surgical treatment for such a lesion-was desired, .the doctor stating that it was-probably a weak disc even though the man might be working at the time he testified on March 28, 1959. Dr. Kirgis concluded that the prognosis for the plaintiff was good and that with conservative treatment he should be able to return to work..
Dr. Rafes, neurosurgeon from Beaumont,. Texas, examined the plaintiff on December 5, 1958. His examination revealed the following :
“The neuro-orthopedic examination revealed the gait to be within normal limits, with the exception of the flat-footedness. There was a slight tendency to favor the left leg. In the-standing position there was a slight straightening of the,low back segment. Forward flexion was limited to about 85 per cent of normal, though the patient could get to within about 8 inches- *497 of the ground. There was slight straightening of the low back segment with this maneuver, though there was slight rounding present. Side to Side and backward bending were fairly well performed. The patient walked on toes and heels with minimal difficulty. In the prone position there was some vague tenderness over the LS spine, over the upper portion of the sacrum, and possibly over L4. There was no definite paravertebral tenderness, no sciatic tenderness. When the patient point to the location of his pain when lying down, he pointed to the L5 area, and then laterally over the buttock to an area which was not down the true sciatic distribution. The patient then stated the pain ran down primarily the lateral though slightly posterolateral portion of the leg. The sacro-iliac strain test was negative.
“In the supine position straight leg raising on the right was to about 80 degrees, on the left to about the same. The patient complained of back pain but no sciatic pain. The fake ■reinforced Lasegue’s sign was positive bilaterally, but actually the patient really complained of more pain down the left leg in the true sciatic distribution on dorsiflexion of the foot than he did on the fake test, and it may be that there is a functional overlay.—
* * * * * *
“A. (Resuming) * * * with some true sciatic pain on reinforcement test on the left and not on the right. The lumbosacral test was diffi-cult to carry out with the patient being ttnable to flex his thighs well, giving a sense of resistance. When he did it spontaneously, he could get it to approximately 70 per cent of normal and complained of back pain with this maneuver. The Patrick test was negative. There was no weakness of the muscle groups of the lower extremities. The sensory testing revealed a ■glove-stocking type of left lower extremity diminution to pain and touch sensation from the umbilicus down anteriorly and posteriorly, with however, the patient complaining of practically no difference over the big toe at first, but then on reconsideration, thinking that even here there was a slight difference. Certainly there was no great difference between .the two sides, at either the LS or SI dermatomes. Knee jerks and ankle jerks were both present and equal in all portions. Other sensory testing included vibration sense, which was minimally different between the two legs; temperature sensation, which was minimally diminished on the left as compared to the right; graphesthesic testing, which was the same bilaterally; and position sense, which was unchanged. There was no clonus; there was no fibrillation. Careful measurements of the lower extremities at the appropriate points revealed no significant differences.
“Q. Did you make any additional studies? A. No, sir.
“Q. State what those were. A. Studies carried out on this patient included x-rays of the chest and lumbosacral spines, CBC, urine, serology, sedimentation rate NPN, and blood sugar. All of these studies were within normal limits.
“Q. Dr. Rafes, based on the history which you obtained from the patient Willie Mitchell, Jr., and the examination which you performed, did you reach any conclusion as to whether Mitchell had a herniated inter-vertebral disc? A. With this examination, and with the benefit of the studies that were carried out, and the total examination of this man, it was my impression that Willie Mitchell did have a mild herniation of the inter-vertebral disc at the interspace between L4 and L5. I must add that a hernia *498 tion of an intervertebral disc in itself, without pressure on the annulus, and without pressure on nerve roots, can be completely asymptomatic; and that my diagnosis was made with primarily the idea that the history which the patient gave, the location of the pain, and the minimal findings that he had, supported the fact that he had a disc, but that the major portion of the patient’s compositive findings on examination, indicated that his greatest problem was a functional one, and not due to the herniation of an inter-vertebral disc.
“Q. Did I understand you to say that there were certain objective findings that you made on which you concluded that there were minimal findings to support a finding of ruptured intervertebral disc? A. Yes, sir.”
Dr. Rafes also took x-rays of the chest and lumbo cervical spine, as well as several other studies and concluded that Willie Mitchell, Jr. did have a mild herniation of the intervertebral disc at the interspace of L4 and L5. He also added that a mild hernia of this type without pressure on the annulus and without pressure on the nerve .roots could be completely asymptomatic. Dr. Rafes further stated that he carefully examined the myelogram taken by Dr. Hatchette and Dr. Alexander, but that the findings were not of a sufficient diagnosis to make a diagnosis of a herniated disc. He felt that in order to prove that there was a small hernia, another myelogram should be carried out. The doctor also testified concerning the plaintiff’s ability to work as follows, to-wit:
“I did not think that the patient had sufficient signs or symptoms to prevent his carrying out heavy work.”
We are mindful of Anderson v. Peek, La.App., 102 So.2d 776, in which case writs of certiorari were denied, wherein the Supreme Court set forth certain rules to aid in a court’s interpretation of the medical testimony and the weight to be given the medical testimony of the various doctors. These rules governing the weight to be given medical testimony are:
“ * * * Thus, the testimony of the attending physican should ordinarily be accorded more weight than that of a physician who has not examined for purpose of treatment. * * *
“And,'where the injury of which complained, fails within a particular field of medicine, the testimony of a specialist in that field is entitled to more weight than that of the general practitioner * *
The only medical testimony we have in the record concerning plaintiff’s injury continuing up to the time of the trial was that of a Dr. Wilson D. Morris, a general practitioner and surgeon with fifteen years practice in Lake Charles. He examined plaintiff on March 23, 1959 and the day before he testified, and the trial began on April 9, 1959.
Dr. Morris was very positive in his diagnosis that the plaintiff had a herniated disc and believed that if another myelogram were taken it would show positive. Although we realize he is not a specialist, on the other hand, his long practice and the fact that he was also a surgeon, together with the intelligent answers and testimony given by him on the subject of herniated discs when compared with the testimony of the specialists in this record, we believe his testimony is entitled to great weight. It must also be remembered that Dr. Morris is not alone in diagnosing plaintiff’s disability as arising from a herniated disc. Dr. Kirgis, a specialist and neurosurgeon, diagnosed it as a herniated disc because he found objective symptoms of a ruptured disc. D,r. Rafes, a neurosurgeon, who examined the plaintiff on behalf of the defendant but was called by the former as a witness and not the latter, was of the opinion that he had a mild herniation of the intervertebral disc *499 at the interspace between L4 and L5. It is true that he thought it would not prevent the plaintiff from doing heavy work, but he is the only doctor in the case who testified that such a condition was not totally disabling, unless repaired surgically. Dr. Hatchette, an orthopedic surgeon and specialist, found upon his first examination of Mitchell that virtually every test given for ruptured discs had resulted in positive findings and it was his opinion that plaintiff probably had a ruptured intervertebral disc. This doctor did change his opinion upon his last examination due to the fact that he thought the plaintiff was greatly exaggerating his symptoms and his examination did not result in positive findings as on the first examination, however, this could be very easily explained by the fact that a person suffering from a herniated disc frequently has remissions, days when there is no pain or trouble apparently. As to Doctor Woodard, a general practitioner, after treating plaintiff for seven months he thought that he had suffered a muscle strain and was again able to work. We agree with counsel for plaintiff that continuous treatment for seven months amounting to more than $500 in medical bills would appear to be more than a mild back or muscle strain.
It would appear that the preponderance of the medical testimony proves that the plaintiff was suffering from a herniated disc and was totally disabled. If it is argued that the medical testimony is in conflict to such an extent that a decision should not be made upon it alone, then we have lay testimony in this record. It is shown that the plaintiff is a young colored man approximately 27 years of age at the time of the injury, with an excellent work .record of six years constant employment with the same employer and no blots upon his record. As a whole the medical testimony shows that he was alert and cooperative and none of the doctors brand him as a malingerer in the least sense. There is testimony of his wife and some neighbors that he had not worked since the accident, which is corroborative of his testimony and that of the doctors who found him with a herniated disc that he was unable to do so. His wife described the severe pain which he suffered with his back.
This medical testimony on its face might appear to be in conflict however, we must in all fairness to the litigants seek to reconcile the testimony if at all possible. It seems logical that if the type of injury that all of the doctors diagnosed plaintiff to have was a mild ruptured intervertebral disc that can reduce itself and become asymtomatic, then the medical testimony can be consistent. This is particularly true in plaintiff’s case where all of the symptoms were indicating a disc injury to all of the doctors at one time or another. The only apparent conflict is the testimony of Dr. Hatchette on March 16, 1959 that plaintiff had no muscle spasms and the testimony of the general practitioner, Dr. Morris, that his orthopedic tests indicated muscle spasms, and a loss of sensation down to the left leg.
Due to the type of injury plaintiff had it was consistent that he could be free from symptoms when examined by Dr. Hatchette on March 16, 1959 and then have several symptoms of disc injury on March 23, 1959 when examined by Dr. Morris.
It has been held that lay testimony is particularly applicable where there is substantial conflict between the medical experts. Christy v. Brown Paper Mill Company, Inc., La.App., 27 So.2d 917, Rutherford v. Frost Lumber Industries, La.App., 57 So.2d 914.
While we believe that the plaintiff has proven his case by a preponderance of the medical testimony and particularly since any difference can be reconciled by the medical testimony to the effect that one suffering from a herniated disc may be examined one day and there be no positive findings and the same test on another day would result in all positive findings, if *500 we assume that it is in irreconcilable conflict, then the lay testimony should he considered, and when this is done the judgment should be in favor of the plaintiff.
For the reasons given the judgment of the lower court is reversed, annulled and set aside, and it is hereby ordered, adjudged and decreed that the plaintiff be granted total and permanent disability not to exceed 400 weeks at the rate of $35 per week with interest on all past due amounts from maturity, subject to a credit for all compensation payments previously paid.
Plaintiff’s right is reserved to recover reasonable future medical expenses up to the statutory maximum of $2,500, less credit to defendant for medical expenses paid to date.
Reversed.