MILLER, Judge pro tem.
Louis M. Costanza filed this suit seeking maximum benefits together with penalties and attorney’s fees under the Louisiana Workmen’s Compensation Law from Crow-son Equipment Company, Inc. Plaintiff alleged in his suit filed on June 15, 1960 that while working for defendant he injured his back as a result of a fall which occurred May 13, 1960 and has since been disabled from performing his work as a mechanic. *218 During the course of the trial evidence was introduced without "objection that no compensation had been paid; that the alleged injuries were sustained on May 13, 1960 when plaintiff fell from a truck while in the course and scope of his hazardous employment with defendant; and that his wages were such that if he is entitled to any compensation, his rate would be $35.00 per week. Defendant denied that plaintiff sustained any disabling injury as a result of the accident of May 13, 1960.
The trial court rendered judgment in favor of plaintiff awarding compensation for the period from May 13, 1960 to October 31, 1960 at the rate of $35.00 per week together with penalties of 12% and attorneys’ fees in the amount of $350.00. Both plaintiff and defendant have appealed.
Plaintiff was standing on tlie bed of a truck when a cable, which was being tightened to lash down a tractor on the truck bed, gave way and struck plaintiff on the calf of the right leg causing plaintiff to fall about four feet to the ground. Plaintiff does not recall his position when he fell to the ground, but knows that he got up unassisted and only complained about the injury to his leg. The loading of the tractor was completed shortly after plaintiff’s fall and plaintiff returned to the shop. Thereafter and on his own initiative, plaintiff went to see Dr. Roy Rose, a general practitioner. Dr. Rose found a bruise of the right calf muscle and Achilles tendon. He gave plaintiff 10 one-half grain codeine pills for pain and advised him to use warm soaks. Plaintiff returned to his work and quit at his usual time. The next day, plaintiff returned to work, but complained of pain in his leg and was sent by his employer to Dr. Rose. Dr. Rose then made x-rays of plaintiff’s leg, but found no deformity. Plaintiff returned to work and worked until quitting time at noon on Saturday.
Plaintiff next returned to work on Tuesday, May 17th, but left work at 3:00 p. m. complaining of pain in his leg. On Thursday or Friday, May 19th or 20th, plaintiff returned to his employer and stated that his leg was better but still bothering him. He stated that he would return to work on Monday, May 23, 1960. However, on Sunday, May 22nd, 1960, plaintiff’s wife, after a most difficult delivery, gave birth to a child. On Monday, May 23rd, plaintiff went to his employer’s place of business and told his employer that he was ready to work but it was necessary for him to arrange to get some blood for transfusions for his wife. On May 24th, plaintiff's wife was discharged from the hospital and that same day, plaintiff told his employer he was going to have to stay home to help look after his wife and children.
Plaintiff’s first complaints of pain in his back were made to plaintiff’s employer about June 1st, when plaintiff told his employer that his back had started hurting on Friday or Saturday, May 27th or 28th, 1960. Plaintiff testified at the trial that his back did not start to bother him until “two or three weeks or a month” after the accident. Plaintiff does not seek any benefits because of the injury to his leg, but limits his claim to the alleged back injury.
Plaintiff’s counsel placed in evidence his demand letter (exhibit P-3, which we do not find in the record) which according to the testimony would show that demand for compensation was made on or about June 1st, 1960. As noted hereinabove, this suit was filed June 15, 1960.
On June 13, 1960, plaintiff was examined by Dr. Dowell, an orthopedic surgeon, at the request of plaintiff’s counsel. Dr. Dow-ell could find no objective symptoms of injury, but based on plaintiff’s subjective history and complaints, Dr. Dowell found that “this patient from his history sustained a contusion of his right leg and a sprain of his neck muscles and paravertebral muscles at the lumbal level.” The history given Dr. Dowell was:
“He gave a history of having been injured on about May 13, 1960, while an employee of Crowson Equipment Com *219 pany. He states that while loading a tractor on top of a truck a cable struck his right leg and threw him to the ground. He said he thought only his leg was initially injured. He was seen by Dr. Rose in Amite, Louisiana, and Xrays were taken of his leg. The patient said that three or four days later he developed pain in his back and neck.” (emphasis added)
It must be noted that this history was either inaccurately stated by plaintiff or inaccurately understood by the Doctor, for the ■evidence is uncontroverted that the plaintiff ¡first noticed back pain at least two weeks after the accident.
Plaintiff consulted the following physicians : Dr. Roy Rose, general practitioner; Dr. J. Willard Dowell, orthopedic surgeon; Dr. Jack Rathbone, general surgeon; Dr. Charles Genovese, general practitioner; Dr. James F. LeNoir, orthopedic surgeon; a Dr. Haslam, orthopedic surgeon; and a Dr. Posey, psychiatrist.
Dr. Rose was called as a witness for the defendant. Plaintiff called Drs. Dowell and Genovese to testify, but did not call Drs. Rathbone, LeNoir, Haslam or Posey. This creates a presumption that these last named physicians, all of whom examined plaintiff at plaintiff’s request, would testify adversely to the plaintiff’s interest. See Barbara v. Lumbermen’s Mutual Casualty Company, La.App., 137 So.2d 466, 469 where this rule is followed and nineteen other cases are cited as authority. In addition to this presumption, there is in evidence as exhibit D-l, a report from Dr. LeNoir addressed to plaintiff’s counsel, stating that he examined plaintiff on August 22, 1960 and on September 2, 1960. The long report concluded that there was “no evidence of injury or residual of injury found at this time.”
Dr. Rose testified that he saw plaintiff as his patient on May 13th and 14th, 1960 and that plaintiff did not complain of back or neck pain. He related that plaintiff came to see him on June 14th to ask the Doctor to help him get welfare assistance. The Doctor advised plaintiff on June 14th, that he “did not feel that he was injured in any way (and) that it would not be to his advantage for me to assist him in any way to make application for help since what I would say would probably not help him in the least.” In addition, Dr. Rose testified that he examined plaintiff at a later date as “a member of the Welfare Panel” to determine whether or not plaintiff would be eligible for welfare benefits. Dr. Rose did not recall the date of that examination other than it was subsequent to June 14, 1960, but did remember that it was the opinion of the panel that:
“the patient could go on the job and get back to work, and we felt that was —that assistance would aggravate rather than alleviate his complaint.”
Plaintiff’s witness Dr. Genovese testified that “I made no examination of him and he never was my patient. I was only carrying out treatment for Dr. Dowell as a technician.” Dr. Genovese gave plaintiff several diathermy treatments at the request of Dr. Dowell. The last treatment was given on August 9th, 1960. When plaintiff continued to complain about back pain to Dr. Geno-vese, he recommended that plaintiff see another orthopedic surgeon, Dr. Haslam, who held office hours once every two or three weeks at the office of Dr. Genovese. Dr. Genovese testified he knew that plaintiff was seen by Dr. Haslam as late as the Saturday before the trial.
If there is any medical testimony indicating that plaintiff suffered an injury to his back as a result of the fall of May 13, 1960, or which relates plaintiff’s complaints to that fall, it would have to be that given by Dr. Dowell. He testified that he examined plaintiff on June 13, June 22, July 7 and July 30, 1960. In his medical report to plaintiff’s counsel dated June 14, 1960, Dr. Dowell stated that:
. “ * * * X-rays of the cervical spine are negative for evidence of frac *220 ture, dislocation, or significant osseous abnormality. The x-rays of the lumbo-sacral spine are also negative for any evidence of bony injury. They do show a congenital anomaly consisting of almost complete sacralization of the fifth lumbar vertebra.
“This patient from his history sustained a contusion of his right leg and a sprain of his neck muscles and para-vertebral muscles at lumbar level. On the basis of this one examination, it does not appear to me to be a severe sprain as he has no sustained muscle spasm at that present time. He does have some apparent discomfort on extension of his neck and of his lower back. In addition he has a congenital anomaly consisting of a partial sac-ralization of the fifth lumbar vertebra which at times is a source of low back pain, and sometimes slows down recovery from a low back sprain. * * * I am not sure on the basis of this one examination as to just what work this patient is capable of doing at this time. I would suggest reexamination of him in approximately four weeks. * * * ”
In his deposition, Dr. Dowell, on cross-examination testified:
“Q. Do you know what’s wrong with this man ?
“A. No sir.
“Q. In other words, you’ve been unable to make a diagnosis of any medical difficulty?
“A. I have made a diagnosis as I’ve indicated in my first report from his— as we stated primarily on the basis of history. And I’ve also made a diagnosis not relating to trauma, but of poor posture. However, if I had no history and (was) asked to establish a diagnosis, and no complaints, it would be hard for me from an objective standpoint to establish a diagnosis on him.
“Q. As far as you know is this man able to go back to work?
“A, I feel he’s able to go back to work, yes, sir.”
As clearly indicated both in Dr. Dowell’s report of June 14th and in his deposition, he based his conclusion that the plaintiff sustained an injury to his back solely on plaintiff’s history that the pain to the neck and back commenced three or four days after the accident. There is no medical testimony in the record suggesting that the pain which plaintiff first discovered two weeks after the accident could be related to the fall of May 13th. At no time was Dr. Dowell apprised of the true fact that plaintiff did not have' any pain associated with his neck or back until at least two weeks after the accident. On cross-examination, Dr. Dowell testified i
“Q. It is normal for a neck strain to become apparent, or a pain to become apparent immediately after the trauma or within several days?
“A. I would say that in a neck strain any time within several days, within the first week would be acceptable. I know that’s true sometimes in automobile accidents that we have a. neck to become more sore during the preceding (following) 2nd, 3rd and 4th days.
“Q. How about back strain?
“A. I think they are usually — usually become sore shortly after the time of injury, or within a couple of days. Now, I have had a few people that have been in bed following injuries. The bed — the injuries have necessitated bed rest, and some of them do not have back pain until they get up and start walking.
“Q. But if, say, the man continued as a mechanic after the accident for a couple of days you would expect him to notice that his back was paining him.
“A. I would expect some back pain, yes, sir. I will say that some of these *221 people do not complain as much the day they have the accident as they do the following day.
“Q. Yes. But they should complain at least by the following day normally, assuming they continue their usual activities ?
“A. That would be, I would say, the usual thing, yes, sir.”
Dr. Dowell did not testify that plaintiff’s complaints which were mentioned in his report of June 14th, 1960, could be related to the accident of May 13th, 1960, where, as the facts clearly proved, the pain was first noticed two weeks after the accident. It is on this basis that we distinguish the case of Christy v. Brown Paper Mill Co., La.App., 27 So.2d 917, which plaintiff contends is “squarely on all fours” with this case. Plaintiff’s physician testified in the Christy case, “that these injuries resulted from the accident * * * and that such injuries produced total disability to do hard work.” Plaintiff further contends that the case of Mitchell v. Morgan Roofing Company, La.App., 118 So.2d 492, is in point. However, a reading of that case conclusively shows that there was a substantial conflict of opinion in the medical testimony.
We are of the opinion that our decision here is controlled by the law as set forth in Guillory v. Southern Farm Bureau Casualty Ins. Co., 237 La. 374, 111 So.2d 314, 318, footnote 3,
“It is the well-settled rule that, where there is no material conflict in the medical evidence, lay testimony will not be considered in a workmen’s compensation case as to an employee’s disability.” (citing cases)
We find no medical testimony based on plaintiff’s correct history, that relates plaintiff’s complaints of back pain to the accident of May 13, 1960.
Since there is no proof that plaintiff’s disability, if any, resulted from the accident, we cannot consider the testimony of the impressive and numerous lay witnesses who testified that plaintiff did complain of pain whenever he attempted to work subsequent to the accident. We must note, however, that plaintiff testified on direct examination that he received $500 to $600 unemployment compensation during the period of his claimed disability. Plaintiff could not have drawn this unemployment compensation unless he represented in his application for these benefits that he was able bodied and ready to work.
It is axiomatic that the plaintiff in a workmens compensation case has the burden of proving by a preponderance of the evidence that he is disabled and that this disability was caused by an accident in the course and scope of his employment. Bankston v. Aetna Casualty Co. of Hartford, Conn., La.App., 132 So.2d 111, Cotton v. Hartford Accident and Indemnity Co., La. App., 116 So.2d 736.
On May 3, 1962, the day this case was orally argued before this court, counsel for plaintiff filed the following motion styled “Motion to Remand.”
“On motion of Louis Costanza, through his undersigned counsel, and upon suggesting to the court, that he is presently (attempting) to work for Johnson’s Cefalu Buick Company in Amite, and upon further suggesting to the court that he is unable to perform all of the functions of a mechanic as he previously did, therefore, his earning capacity is diminished, and all he can do is light work.
“Mover further suggests that he has supporting affidavits that every time he tries to do any heavy work his back commences to pain him unbearibly, so that he constantly complains about his back pain to his fellow workers.
“Your mover further suggests that the attached affidavits will reflect that *222 he is still taking pills for his pain, and that his hack is still bothering him.
“Your mover further suggests that his affidavit will reflect that he is still trying to find some doctor that can cure his back trouble.
“Wherefore, mover suggests that in the basic interest of judgment (justice) that this case should be remanded to the District Court to take the testimony of these additional witnesses, indicating that the plaintiff is still unable to work without pain even subsequent to the original trial of the case, and that he is always complained of pain ever since the accident and has never ceased up to the present time.”
There were two affidavits attached, one from the owner and manager of a drug store stating that he has filled numerous prescriptions for Darvon compound, which is for generalized pain; and the second from one of the witnesses who testified at the trial, setting forth that plaintiff has attempted to work for him since the trial, but that plaintiff complains that his back pain prevents him from doing heavy work.
Plaintiff has not cited any authority which would authorize the granting of this motion. Furthermore, in view of our conclusion that there is no proof that plaintiff’s complaints of back pain are related to the accident of May 13th, it would serve no purpose to remand the case for this testimony.
The final issue raised by plaintiff appellant in this appeal concerns the trial court’s ruling that although plaintiff was at his request declared to be a pauper and therefore entitled to the benefits of LSA-C.C.P. art. 5185, his counsel was, prior to trial, required to advance $9.30 to cover witness fees for all witnesses subpoenaed in excess of six. This ruling was based on the provisions of LSA-R.S. 13:3671 which provides:
“A witness living in the parish where the court is situated'who attends court in compliarce with a subpoena is entitled to receive a fee of one dollar a day for every day he is in attendance at court, and mileage at the rate of five cents a mile for the distance he is required to travel in going to and returning from the court.
“The fees and mileage of not more than six witnesses subpoenaed by each party may be taxed as costs of court. The fees and mileage of witnesses in excess of that number shall be paid by the party who subpoenaed them.”
Plaintiff relies on LSA-C.C.P. art. 5185, which provides that:
“When an order of court permits a party to litigate without the payment of costs, until this order is rescinded, he is entitled to:
“(1) All services required by law of a sheriff, Clerk of court, court reporter, notary, or other public officer in, or in connection with, the judicial proceeding, including but not limited to the filing of pleadings and exhibits, the issuance of certificates, the certification of copies of notarial acts and public records, the issuance and service of subpoenas and process, the taking and transcribing of testimony, and the preparation of a record of appeal; * *
It is to be noted that this law makes no provision relieving the pauper from the payment of witness fees. It is our opinion that the judgment of the trial court which sustained the clerk of court’s position that a deposit must be made for witness fees for all witnesses subpoenaed by plaintiff in excess of six is imminently correct.
For these reasons, the judgment of the trial court is affirmed insofar as it denied plaintiff’s claim for reimbursement of the $9.30 advance court costs deposited by plaintiff’s counsel for witness fees. The remainder of the judgment is reversed and plaintiff’s demands against the defendant are rejected at the plaintiff’s costs.
Affirmed in part and reversed in part.