JOHNSON, Judge.
The judgment in this case awards the plaintiff maximum workmen’s compensation for total permanent disability, penalties and attorney’s fees. The defendant is the workmen’s compensation insurance carrier for the Empire Machine Works, Inc., plaintiff’s employer. The defendant has appealed.
The plaintiff had been steadily employed for ten or twelve years by Empire Machine Works, Inc. His earnings exceed $300.00 per month. The employer’s business and plaintiff’s occupation were hazardous in nature and in the performance of his duties as mechanic he was required to handle motors and machinery and do heavy lifting. On May 17, 1961, the plaintiff suffered personal injuries in an automobile accident. It is admitted by defendant that plaintiff was driving his employer’s motor vehicle in the scope of his employment when the vehicle was involved in an accident.
In that accident plaintiff received a blow to the chest by the steering wheel of the vehicle striking him with sufficient severity *523 that his chest was bruised and the seventh rib was fractured in the mid-axillary region. He went back to work the next day. During the day he kept complaining that his chest hurt him and in the afternoon Mr. Prest, president and manager of the Empire Machine Works, insisted that he go to see Dr. Reeves. The doctor did not take an X-ray at that time and did not listen to plaintiff’s heart beat, but strapped his chest and administered other treatment through May 29, 1961. In the meantime, Dr. Reeves determined that the rib was broken. However, the doctor advised plaintiff that he could return to light work on May 29. When plaintiff returned to his place of employment he informed Mr. Prest that the doctor had limited him to light duty and Mr. Prest testified that he had an understanding with plaintiff that plaintiff would not do any lifting or heavy labor and he instructed his employees that if plaintiff needed assistance to move or lift something that he should be given help. Plaintiff continued to work until July 1, when he arranged to borrow his employer’s boat and motor to go fishing the next day, which was. Sunday. The employer said that he and another employee put the motor on the boat and loaded the necessary equipment and that all plaintiff had to do was to drive off. Plaintiff’s wife said he left home that Sunday morning about .4:30 o’clock. Before 6:00 o’clock a. m., Mr. Prest was called to his plant and upon arriving immediately he found that another - fisherman had driven plaintiff’s car, bringing plaintiff to the plant in a serious condition. Plaintiff’s wife came and took her husband to Hotel Dieu in New Orleans. Dr. Salerno was called and he found plaintiff almost at the point of death as a result of heart failure. Plaintiff survived but was still in such serious condition that the doctors testified that he should not be brought to Court and should not even be questioned in taking his deposition in the hospital. The case was tried on the 13th and 17th of October 1961.
The evidence does not show what happened on that Sunday morning. Mr. Prest testified that the boat, the fishing tackle and the bait box were still exactly as he loaded them the day before. From the testimony of the experienced medical men there can be no doubt that plaintiff had a very serious heart attack caused by acute anterior myocardial infarction.
The case boils down to the issue as to whether the heart trouble that now disables him is related or attributable to the injury received by plaintiff in the automobile accident on May 17, 1961. After a review of the record and testimony we find that the district Judge, who heard the witnesses, has written a very clear and understandable discussion of the case, which we approve and adopt his reasons as our own, as follows:
“Plaintiff returned to his employer and found he could not perform his services without difficulties. He complained continuously of chest pains and shortness of breath from time to time which fact was testified to by both R. E. Prest, Jr., President and R. E. Prest III, Vice-President & Shop Foreman of Empire Machine Works, Inc. Finally R. E. Prest loaned plaintiff the company boat to go fishing on July 2nd to spend the day relaxing. Plaintiff while in the bayou, but before he could do any fishing, suffered an acute anterior myocardial infarction.
“Plaintiff was rushed to Hotel Dieu where he was confined to bed under care of physicians and specialists and registered nurses around the clock and was still so confined at the day of the trial.
“Plaintiff sued The Ocean Accident & Guarantee Corp., Ltd., as the insurer of Empire Machine Works, Inc., alleging total permanent disability for maximum compensation at 400 weeks, medical expenses in excess of $10,000.00, attorney fees of $5,-000.00 and interest and penalties on all the above. At the trial the prayer for medical expenses was amended by consent and stipulation to the sum of $12,500.00.
“Defendant’s insurance company admitted that plaintiff was involved in an auto *524 mobile accident on the 17th of May, 1961, that the accident was in the course of his employment by Empire Machine Works, Inc., insured by defendant, that defendant paid compensation benefits to plaintiff until May 30, 1961, that following plaintiff’s heart attack on July 2nd defendant paid compensation under the statutory reservation until they could make an investigation into the medical issue but did not pay the nurses’ bills or hospital bills until its medical investigation was completed. However, pending the completion of the medical investigation, and on recommendation that the employee was in desperate financial condition and unable to pay the nurses, the defendant did pay nurses for three weeks, and, when the medical investigation was completed and upon reports being submitted to the effect that the heart attack was not related to the automobile accident, both compensation and nursing benefits were stopped.
“Defendant has denied that the heart attack was in anyway related to the injury suffered in the scope of plaintiff’s employment and accordingly has refused compensation and payment of medical expenses.
“The sole question involved in this matter is whether the heart attack is related or not to the injuries received by plaintiff in the automobile accident of May 17, 1961, and if so' related, whether said attack was sufficiently crippling so as to make plaintiff totally and permanently disabled.
“In order to resolve this question plaintiff produced four medical witnesses and the defendant three whose testimony must be analyzed to determine this issue.
“Plaintiff produced the deposition of Dr. John J. Signorelli who testified that he first saw plaintiff on July 9th, 1961 when he was called in by Dr. E. F. Salerno, plaintiff’s family physician. Dr. Signorelli testified that at that time plaintiff’s condition was critical and after studying the electrocardiogram records made by Dr. Joseph E. Schen-thal a week earlier he found plaintiff to be suffering from acute anterior myocardial infarction and that he continued to see plaintiff on a daily basis thereafter.
“Dr. Signorelli was asked on direct examination by Mr. Provensal T would like to know your professional opinion as to whether or not there was any connection between the automobile accident of May 17, 1961 and the myocardial infarction that you found on July 9th ?’
“Dr. Signorelli’s reply to that question was ‘my professional opinion is that there is a relationship between the accident and his subsequent coronary thrombosis and myocardial infarction.’
“ ‘And how do you base your opinion as to this connection, Doctor ?
“ ‘My opinion is based on several factors: one, the proximity of the heart and the area in which the man was injured; two, the fact that the infarction involved the anterior surface of the heart, or the front part of the heart which was in closest proximity to the chest wall; three, I have the impression from discussing this man’s past medical history, and in talking with his family physician, that this man was in very good shape prior to the auto accident. Those are my reasons.’
“Dr. Signorelli further testified as to the disability of plaintiff as follows:
“ ‘From your experience in your specialty, what is your opinion as to the ability of the patient in the future to go back to his former occupation ?
“ T would not advise it.
“ ‘Why?
“ ‘Because I believe that with what he now has, from a cardiac standpoint, that the type of work that he did before would be a hazard to his welfare from a health standpoint.
“ ‘So that you believe that he will not be able to engage in his former occupation in the future?
*525 “ ‘That’s correct, I would not recommend it.’
“On cross-examination, Dr. Signorelli responded to a question by Mr. Loeb as to the electrocardiogram readings of plaintiff before the accident stated as follows:
“ T had not seen them; I was told that they were normal by his family physician. Getting back to the basic mechanism that I believe would be the factor which started the chain of events that led to the coronary thrombosis in this patient, I would put it together like this: certainly as a result of trauma it was part of my opinion from his description that there was a certain amount of trauma, and that he had had some hemmorhage within the walls of his coronary artery, and what we call dissection within the wall of the artery, and that he went along for a period of — I later learned from these dates a period of — approximately six- and-a-half weeks when, as a result of the hemorrhaging within the wall of the ar.tery, he had a gradual narrowing of the artery. So, perhaps at the time of the acute occlusion, more dissection of the blood along the walls of the artery actually narrowed it to the point where he developed the coronary occlusion leading to the acute episode of July 2, and leading to the resultant myocardial infarction.
“ ‘So it was your theory—
“ ‘Opinion.
“ ‘Opinion, that the trauma to the part produced hemorrhage within the coronary artery?
“ ‘Yes.’
“Dr. Joseph E. Schenthal was next called by the plaintiff. Dr. Schenthal first saw plaintiff on January 9, I960' in an examination at the request of Dr. Salerno and in his opinion, at that time, that there was no significant abnormality on physical examination or on fluoroscopic examination and electrocardiographic examination. That he next saw plaintiff on July 2, 1961 in Hotel Dieu about nine o’clock in the morning, that he was under oxygen and practically moribund, that he took an electrocardiogram that morning, and again that evening and after the physical examination he diagnosed plaintiff’s condition as being a myocardial infarction involving the anterior surface of the heart but that the myocardial infarction was not typical of one which had just occurred, that after treatment and handling of the emergency situation and being, able to get a history from plaintiff days later when he was physically able and discussing the matter with Dr. Salerno, the family physician, he learned of plaintiff’s accident and hitting the steering wheel, that Dr. Schenthal was able to satisfy and explain to himself the appearances of the electrocardiogram which was not typical of myocardial infarction which had just occurred. That the evidence of myocardial infarction and destruction of tissue, which was appearing as a much older duration from the electrocardiogram than you would expect at that time, that the electrocardiogram was not typical and did not fit the picture of plaintiff as he looked to Dr. Schen-thal clinically. That Dr. Schenthal had the impression that plaintiff had a previous myocardial infarction of the anterior part of the heart, and, as time went on, it was his impression that this area was extending to involve other areas of the heart, that at this time he had no knowledge of plaintiff striking the steering wheel. By July 30th Dr. Schenthal began to get a history from plaintiff and learned of the accident.
“In testifying as to his opinion as to the course of plaintiff’s attack Dr. Schenthal stated:
“ ‘In hindsight, including the physical examination and talking with Mr. Tul-lier, taking his history personally, evaluating the symptoms and signs .that he presented and is presenting, including in this with the evaluation of the whole person, the electrocardiograms-and laboratory examinations, which are subse *526 quently present, it had been my opinion that this is a myocardial contusion and infarction, related to the impact of this man, in the upper age bracket, when he hit the steering wheel on May 17, and that the — and this is based on the fact that the impact was so severe and the location was right over the heart and the blow was so severe that it not only struck the area of the chest but compressed the heart between the anterior and posterior chest walls when it was sufficient to snap a rib, and that this is a common source of myocardial contusion in two ways: one is the impact of the heart against the chest wall, when the blow is sustained; and the other is that he incurred what is the probable contusive effect, as the blow is transmitted through the tissues. One of the things that stands out in this man’s case, that is typical, is his precordial pain. Time after time I have questioned Mr. Tullier to see if there is any change in his history and, time after time, he has come up with the same history of pain over this area and not particular pain over the fractured rib. And shortness of breath is one of the common aspects of myocardial contusions of this type.’
“He further testified that a man with this type of heart pathology was in no condition to do heavy work in the future.
“He was asked on cross-examination whether his diagnosis was myocardial infarction and myocardial contusion and his reply was ‘yes’ and on being asked which occurred first replied:
“ ‘Let me put it this way. No one can tell which occurred first, a hundred per cent, but, in putting the whole picture together, with this type of blow in this age group, which is more susceptible to this type of blow, with the force of the blow that was involved, enough to spring his rib and force his heart in a compression maneuver, along with the normal findings prior to 1961, putting the whole picture together I would feel that the vast weight of evidence is that the contusion came first.
“ ‘What do you mean by vast weight of evidence?
“ ‘Well, the physical examination, talking to the person, examining the heart myself, seeing the area involved with the blow, as he looked at that time and as he looks now, and combining that with the electrocardiographic evidence, everything points to, in my opinion, the blow of this magnitude being involved, that one thing against it is the time factor. The time factor is the major thing and only thing which is against a hundred per cent situation here. And the electrocardiographic findings, in my mind, combined with the history and physical findings, make me feel that the myocardial contusion came first.’
“Dr. Schenthal was asked on cross-examination as to the time elapse between the accident and the attack and replied that it would depend on the person’s age, physical appearance, and status of his body, that from his experience he had patients with different reactions to these injuries and that a doctor had no way of knowing without holding the heart in his hands.
“Dr. Keith Reemtsma was the next witness called by the plaintiff. He stated that he was called in by Dr. Salerno because of a suspicion of surgical complications of this heart disease. That after consultation with the plaintiff and Dr. Salerno he was of the opinion that there was a probable relationship between the accident and the condition that precipitated plaintiff being hospitalized.
“On cross-examination Dr. Reemtsma was asked ‘what did you think he had? How did you relate the accident to the condition ?’ and gave this reply:
“ T suspected and, again, this is unproved — but I suspected that the injury to his anterior chest wall, which was severe enough to produce a rib fracture *527 and bruising-, might have damaged the anterior wall of the heart and probably the coronary vessels. That this damage was such that it was not immediately apparent, other than that there was chest pain with exertion. That subsequently, in July, he developed an extension of a process — myocardial infarction. This is conjectural.’
“Plaintiff’s last medical witness was Dr. E. F. Salerno, the family physician a graduate of 1910, who saw plaintiff on the 3rd day after the accident of May 17th. On examining plaintiff he noticed a discoloration in the upper margin on the outer aspect of the sternum. This extended downward toward the axilla, on what we say is the midsection of the arm, down on the chest. The muscles were very painful by palpitation and especially in the area of the seventh rib, circulating from the margin of the fourth rib down and going over to the seventh rib, that it was very painful and that plaintiff responded to pain quite attentively, that plaintiff was black and blue with a discoloration of the skin, that at the next visit plaintiff was still in pain and a little bit short winded, that he returned a few more times still complaining of pain and stating that the pain radiated into his arm but Dr. Salerno discounted this believing plaintiff to be imagining the arm pain and continued to treat him for a broken rib.
“Dr. Salerno testified he saw plaintiff on July 2nd and that he was in such a state of shock that he did not think plaintiff would survive. He called Dr. Schenthal who took an electrocardiogram and said plaintiff’s condition was very serious. Dr. Salerno became of the opinion that plaintiff had a contusion of the muscle of the heart and accordingly sent for Dr. Reemtsma, a heart surgeon because he thought that plaintiff might have a ruptured heart. That he also made a consultation request for Dr. George E. Burch who did not respond and then called in Dr. Signorelli.
“Dr. Salerno testified that he had treated thousands of infarctions as well as many who had heart contusions; that in addition to the machines a doctor must still rely on his clinical examination and diagnostic ability (to which the Court agrees) in order to reach a proper diagnosis. That his diagnosis was that plaintiff had suffered a myocardial contusion. When asked on cross-examination as to what proof he had that plaintiff had a coronary contusion, Dr. Salerno replied:
“ ‘First, when he was brought in, on July 2, he was in complete shock and pulseless. That pulse was of such a character that the heart was just getting ready to close its last — what I call fimbration. Then you have fimbration which showed an embarrassment of the heart.
“ ‘Now, the question comes up, of course, out of all of that you have got to keep working and studying these patients and problems, and that’s the reason why consultants were called in. And, after consultants were called in, it became apparent that my suspicion of contusion was corroborated. It was, and they all agreed.’
“In further explaining in response to defendant’s attorney’s questions:
“ ‘How does the fact that this patient was near death, when you saw him, prove that he had a contusion of the heart ?
“ ‘He didn’t get that contusion that morning. That is the aftermath of his injury in which he was carrying that damaged muscle. That is like I give you a punch in the eye. From the punch in the eye, you might have ec-chymosis. You may have underneath bruised blood vessels, which is very minor, but a deeper one that ruptured.
“ ‘That is the point, you may have.
“ ‘It was no may have in this one. It was because he proved the symptom-atology of it from his clinical findings.’
*528 “Defendant offered the medical testimony of three witnesses the first of which was Dr. Samuel B. Nadler. Dr. Nadler testified that he had examined the hospital charts and records and reports of the doctors treating plaintiff but that he had never seen plaintiff nor examined him clinically nor had any discussions with Dr. Salerno or other attending physicians and it was his conclusion that there was no probable or possible connection between the automobile accident and the event which transpired on July 2, 1961 after documenting the events stated the following:
“ ‘Now, this is the sequence of events which, I think, are two separate and distinct events for several reasons. First, if this man had sustained a blow to his heart, which would have started or initiated the development of a thrombosis of the artery, his clinical course would not have been the one he showed. This man got better as time went on and not worse. If he were having progressive thrombosis of his arteries, he would be getting worse and not better. That is clinical point one.
“ ‘Clinical point two is that on the basis of our experience with a large number of people who are beginning to block off a coronary artery and who do accomplish this, the maximum period of time in which this occurs — and this is a long period while it occurs— and this is a long period of time while it occurs, not in a few seconds, in an hour, or two or three days — the longer period of time is ten to fourteen days for the development of myocardial infarction. Now, if a patient does have the myocardial infarction by the end of two weeks, then it would be fairly safe to say that that could have transpired on day one; had accomplished all it was going to accomplish by the end of the fourteenth day. This man, after fourteen days, became progressively better; was relatively free of discomfort, except the thing that caused the cracked rib to hurt on the site of the chest.
“ ‘Then, out of a clear blue sky, he developed the massive infarction of the heart muscle, which unquestionably, clinically, was the sudden onset of a coronary thrombosis.
“ ‘Now, one may well ask if a man sustains a contusion to the heart, what does that mean ? The man may sustain a contusion to the heart, which means that he develops a bruise of the heart. Now, that bruise may involve a coronary artery, but what I have just said holds that if that individual sustained a bruise to the heart, involving the coronary artery, then that artery should progress to thrombosis with no greater lapse of time, surely, than ten days to two weeks.’
“On cross-examination Dr. Nadler who has never examined plaintiff and based his opinion solely on the hospital records was asked certain questions about plaintiff and his replies indicate to the Court that Dr. Nadler did not possess a sufficient knowledge of this plaintiff’s condition to properly evaluate it, particularly when he states that it was his understanding that plaintiff was on the job eight hours a day every day from the time he went back to work until July 2nd which fact has been disproved by the two officers of the company defendant insured.
“The defendant also offered Dr. George E. Burch who testified he had examined the hospital records of Hotel Dieu, the reports of the various physicians who had seen plaintiff, plaintiff's past history as well as the report of Dr. Reeves but had never seen plaintiff. He testified that as a result of such examination he could not find any evidence that there was a connection between the accident and what happened to his heart • — the heart attack on July 2, 1961, that from his experience is that if they were related the attack would have come at a closer time to the accident, that this is the usual situation and that the records only presented *529 an ordinary myocardial infarction, that he based this conclusion that there was no evidence in the record. When asked if the condition could be so subclinical that it would be undetected in the period of six weeks and four days he replied ‘this is completely possible but unlikely.’
“It is the Court’s understanding from the doctor’s testimony that neither an electrocardiogram or an X-ray taken immediately after the steering wheel accident would have revealed any signs which would have indicated that a contusion of the heart had occured so that the diagnostician must rely on the patients complaints and symptoms such as a pain in the chest and shortness of breath which are the very symptoms plaintiff complained of when he returned to do light work. He further testified that:
“ ‘If the contusion were extremely minor, it, of course, could repair on its own. However, if the contusion is rather extensive with hemorrhaging and the like, you would expect progressive deterioration in the heart function, in the cardiac state. If it were minor, it might heal without knowing it.’
“On cross-examination Dr. Burch admitted that he had never talked to plaintiff to get his case history as to how he felt nor had he talked to Dr. Salerno, Dr. Reem-tsma, Dr. Schenthal or Dr. Signorelli about the patient’s condition and that the only information he had on plaintiff’s condition prior to July 2nd was from hospital records and Dr. Reeves. When asked whether he would presume to know more about the patient that you have not seen than the attending internist and the other physicians his answer was ‘No’.
“It is apparent from the testimony of Dr. Burch that the data made available to him by defendant failed to present a true picture of plaintiff’s condition.
“The Court is further informed by Dr. Burch’s testimony that it is better to obtain the case history from the patient rather than other sources as was done in this case by defendant’s doctors.
“Defendant’s last witness was Dr. J. T. Reeves, Buras physician who treated plaintiff for the contusions of the chest and abdomen and fractured rib initially. The Court finds nothing in the testimony of Dr. Reeves except that he treated the patient from May 17th until May 30th when he allowed plaintiff to return to do light work, that plaintiff complained to him of pain in his chest increasing and that on the visits either the doctor or his nurses gave plaintiff diathermy after originally supporting the rib with a rib belt. That at no time during his treatments did Dr. Reeves examine plaintiff’s heart or listen to his chest although plaintiff complained of pain in his chest, that he next saw plaintiff on the morning of July 2, 1961 and diagnosed him as an acute cardiac — an acute heart attack.
“There was no testimony offered by defendant to rebut plaintiff’s testimony that plaintiff is totally and permanently disabled as a result of the anterior myocardial infarction.
“The plaintiff has presented medical testimony to establish the fact that the anterior myocardial infarction is a result of a contusion of the heart, suffered on May 17th, the day of the accident. Defendant’s testimony in opposition thereto does not rule out the probability of the relationship but takes the view that the time element is not proper, a conclusion reached without either Dr. Nadler or Dr. Burch once examining the patient.
“It is a well established rule, and was so held in Huey P. Booker vs. Phoenix Insurance Company [La.App.], 124 So.2d [246] 247, 248 that the testimony of the attending medical expert of claimant was entitled to greater weight than that of other expert medical witnesses, where he had better opportunity of evaluating the extent of claimant’s injury by reason of sustained period during which claimant was under his *530 direct observation and treatment, than was accorded other medical experts whose knowledge of claimant’s condition was restricted to one examination each. This rule has also been set forth in Walker vs. Monroe et al [La.App.], 62 So.2d 676; Willie Mitchell, Jr. vs. Morgan Roofing Company, Inc., et al [La.App.], 118 So.2d 492; Burley Anderson vs. Robert Peek, dba Peek’s Auto Service, et al [La.App.], 102 So.2d 776; J. Monroe Cotton vs. Hartford Accident and Indemnity Company [La.App.], 116 So.2d 736, and Ben Williams vs. New Amsterdam Casualty Company [La.App.], 121 So.2d 760. In the present case Dr. Schenthal attended plaintiff daily while defendant’s two medical experts, Drs. Nad-ler and Burch, never saw or examined plaintiff and testified only from the hospital records.
“As to the testimony of defendant’s doctors from said hospital records it has been held that in a workmen’s compensation case, where hospital records of deceased employee were not in evidence, opinion of certain doctors based on facts allegedly contained in such records were without probative value and could not be considered by the Court in determining whether there was a causal connection between certain injuries sustained by decedent in the course of his employment and his death due to a heart attack, Roberta T. Keener vs. Fidelity and Casualty Company of New York, [La.App.], 96 So.2d 509.
“It is therefore the opinion of this Court that plaintiff’s heart condition is a direct result of the injury received in the course of his employment on May 17th, 1961 and that he is totally and permanently disabled.
“It is also the opinion of this Court that the defendant insurance Company was arbitrary and capricious in not continuing the compensation payments and in refusing to pay any medical, except a temporary payment of three weeks nursing, and for this reason will allow the statutory penalties and attorney fees as provided under the compensation statute.”
We cite the case of Sharp v. Esso Standard Oil Company, La.App., 72 So.2d 601, as being quite similar to the case at bar. In that case Sharp had an accident on the job on November 13, 1950, but this did not disable him. He continued to work until the morning of December 13, 1950, when he suffered a severe heart attack, which put him in the hospital until January 14, 1951. He was unable to work thereafter but he did improve and moved about freely until October 19, 1951, when he died sitting in his automobile after returning from church. An autopsy disclosed that Sharp had an anterior myocardial infarction, which sounds like the same thing with which plaintiff Tullier is suffering in this case. The question in the Sharp case was whether the accident of November 13, 1950, which did not disable him, caused or contributed to the heart attack one month later, and additionally, did either or both cause or contribute to his heart attack almost a year later resulting in death. The medical experts were in definite and positive disagreement. That disagreement was resolved by the Court against defendant. The experts for defendant in that case knew Mr. Sharp; had examined him any number of times. In this case now before us, Dr. Nadler and Dr. Burch, for defendant, had never seen the plaintiff in this case and confined their research to hospital records, none of which was offered in evidence, and some of which, the testimony shows, was sketchily recorded. We can understand that accurate records of tests and graphs made and fully recorded by experts can convey to another expert helpful information, but common sense dictates the conviction that personal contact by an expert with the patient, not once, perhaps, but repeated and continued contacts, with full knowledge of the patient’s personal and medical history should play a realistic and impressive part in arriving at conclusions in most cases.
In the Sharp case supra at page 610, there is a quotation from Larson’s Workmen’s *531 Compensation Law, Vol. 2, § 80.32, page 322. We quote part of it, as follows:
“The distinction between probability and possibility should not follow too slavishly the witnesses’ choice of words, as sometimes happens in respect to medical testimony. A doctor’s use of such words as ‘might’, ‘could’, ‘likely’, ‘possible’ and ‘may have’, coupled with other credible evidence of a non-medical character, such as sequence of symptoms or events corroborating the opinion, is sufficient to sustain an award. It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. * * * ”
In discussing the allowance of penalties and attorney’s fees in this case counsel for defendant mentions the fact that the suit was filed in less than sixty days after the heart attack of July 2, and suggests that defendant is entitled to sixty days in which to arrive at a determination of liability. That is true provided compensation is regularly paid while the time runs. In this case, however, it would appear that the time should run from May 17 rather than from July 2. The evidence does not disclose that defendant had paid any compensation after May 29 when this suit was filed on August 17. The petition alleges that no payment had been made, but it does say that the defendant sent to plaintiff’s attorney on August 2 five drafts for compensation payment for the period ending July 23, which drafts define plaintiff’s disability as “temporary total.” These drafts were refused because an endorsement of them might in some way restrict the nature of the claim. It is not necessary to pass upon that point here. The uncashed drafts were offered in evidence but they were not physically filed, at least they are not with the record. If any other compensation payments were made after that, the evidence does not disclose it. Defendant’s answer was filed September 22 and it alleges that payments were made to September 18 for a total of $355.00. The trial Court allowed credit in that amount and, therefore, we assume payment was made between August 17 and September 22. The payments of compensation not being currently made when the suit was filed on August 17, the sixty day period referred to can be disregarded. Defendant had due notice or knowledge of this claim, as it is shown that Mr. Mancuso, adjuster for defendant, was in constant touch with the situation and actually tried to get plaintiff moved from a private room to one less expensive at a time when the doctor said to move the plaintiff would endanger his life because of his critical condition.
Counsel for defendant further argues that on September 18, 1961, defendant’s medical information was to the effect that the heart attack of July 2 was not brought on by activity in the course of plaintiff’s employment and no penalties should be allowed. It is assumed that defendant obtained this information from Dr. Nadler and Dr. Burch, who testified on the trial, but neither of whom ever saw or examined the plaintiff. Dr. Nadler indicates that the only records he saw were from the hospital and a letter from Dr. Reeves. Dr. Reeves does not claim to be an expert in this field; he did not treat plaintiff after July 2, 1961, but did treat him from May 17 to May 29 after the automobile accident. Neither Dr. Nad-ler nor Dr. Burch discussed the case with Dr. Salerno or any of the other doctors connected with it, though Dr. Nadler was offered the opportunity to examine the plaintiff and arrangements were actually made for him to do so, but he declined and rested his information on some records. The opinions of Dr. Nadler and Dr. Burch are rendered practically valueless insofar as an appraisement of the evidence in this record is concerned and amount to little more than hearsay evidence. Dr. Burch explained that knowledge of several things from the patient’s personal experience would be of value to him. It is presumed, though the record does not disclose it, that defendant had reports from plaintiff’s medi *532 cal experts. If not, they were available. In this situation, defendant maintains that it was completely justified in its refusal to pay compensation in the face of the medical opinions of Doctors Salerno, Schenthal and Reemtsma, who saw and examined plaintiff almost daily, and who must have reported, as they testified, that his heart condition was caused by the automobile accident of May 17. Weighing the medical evidence in this light, we consider it in decided imbalance with no other conclusion reasonable than that plaintiff’s disability definitely was caused by and relates to the automobile accident of May 17. That the Court could decide otherwise was a calculated risk on the part of defendant. In these circumstances, it is our conclusion that the trial Court was correct in deciding that defendant’s refusal to pay compensation was arbitrary and without probable cause in the sense of the use of those terms in the statute.
The medical and nursing expenses were stipulated to be $12,500.00, which is a large amount for one case in so short a period. The insurance policy offered in evidence shows the insurance liability for these items to be a maximum of $25,000.00. Counsel suggests that this Court should review the doctors’ bills with a view of cutting them down. There is no evidence on which to base such a study.
The trial Court allowed penalty attorney’s fees in the sum of $5,000.00. From a review of quite a number of compensation cases on the subject of the amount oí attorney’s fees heretofore allowed, we have found none that fixed the amount at more than $2,000.00, and that was in the case of Finn v. Delta Drilling Co., La.App., 121 So.2d 340. The defendant here being an insurance company, the liability for penalty attorney’s fees is provided in LSA-R.S. 22:658. A determination of the amount of penalty attorney’s fees is left to the Court’s discretion. The only criterion to guide the Court is the condition of the record before us. From it the Court can gain some conception of the complexity of the issues, the amount of study and time spent in preparation, and the learning and skill of plaintiff’s counsel in presenting evidence and argument. The trial of this case consumed two days. In all of these so-called tests we consider that said counsel displayed a high degree of learning and ability. We do not wish to be understood as discounting these attributes on the part of counsel when we reduce the amount allowed as penalty attorney’s fees. We conclude that $3,000.00 penalty attorney’s fees to be paid by defendant is reasonable, this fee to be in addition to the maximum attorney’s fees to be paid by plaintiff as provided by LSA-R.S. 23 1141. '
For these reasons the judgment of the trial Court is amended by reducing the penalty attorney’s fees from $5,000.00 to $3,-000.00 to be paid by defendant in addition to the maximum attorney’s fees to be paid by plaintiff as provided by LSA-R.S. 23 :- 1141 and as thus amended the judgment is affirmed.
Amended and affirmed.